JUDGE STANTON

**13 CIV 9150**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LANDOL FLETCHER AND ALL OTHERS
SIMILARLY SITUATED,

       Plaintiffs,

v.

CONVERGEX GROUP LLC, CONVERGEX
EXECUTION SOLUTIONS LLC, CONVERGEX
GLOBAL MARKETS LTD., CONVERGEX
HOLDINGS LLC, G-TRADE SERVICES LLC, &
DOES 1-10,

      Defendants.

CIVIL ACTION NO.

DEC 2 6 2013

U.S.D.C. S.D. N.Y.
CASHIERS

CLASS ACTION COMPLAINT FOR
VIOLATION OF ERISA

1

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ................................................................................4

II. JURISDICTION AND VENUE .........................................................................6

III. PARTIES ...........................................................................................................8

    A. Plaintiff ........................................................................................................8

    B. Defendants ...................................................................................................8

IV. FACTUAL BACKGROUND............................................................................9

    A. Plaintiff's Plan ............................................................................................9

    B. Defendants' Status as ERISA Fiduciaries ...............................................11

    C. Defendants' Double-Charging Scheme .....................................................13

V. THE RELEVANT LAW ...................................................................................15

    A. Fiduciary Duties under ERISA .................................................................15

    B. Co-Fiduciary Duties under ERISA ...........................................................16

    C. Prohibited Transactions under ERISA § 406(b) .......................................18

    D. Civil Remedies under ERISA ...................................................................18

VI. CLASS ALLEGATIONS.................................................................................19

VII. CLAIMS FOR RELIEF .................................................................................22

    COUNT I ...........................................................................................................22

    COUNT II ..........................................................................................................24

    COUNT III .........................................................................................................25

VIII. PRAYER FOR RELIEF ...............................................................................27

## CLASS ACTION COMPLAINT

1.      Plaintiff Landol Fletcher brings this action on behalf of himself and the Central States, Southeast and Southwest Areas Pension Plan (the "Central States Plan"), an ERISA[1] employee benefit plan in which he is a participant, and as a class action on behalf of the participants, beneficiaries, and named fiduciaries of ERISA plans, for which any Defendant, or any of their subsidiaries, provided (i) brokerage services or (ii) transition management services where Defendants added unauthorized and undisclosed markups and markdowns under their double-charging scheme.  The Class Period is October 2006 through December 2011.

2.      These allegations are based on various sources including publicly available press releases and settlement documents from the United States Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ"), news reports, publicly available documents such as Internal Revenue Service Forms 5500 filed annually for ERISA Pension Plans with the U.S. Department of Labor ("DOL"), filings with the Financial Industry Regulatory Authority, Inc. ("FINRA"), and company websites. The allegations are based upon personal knowledge as to Plaintiff and his own acts, and upon information and belief as to all other matters.

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.*

## I.  NATURE OF THE ACTION

3.      This suit is brought to recover losses and obtain equitable relief related to a double-charging scheme that Defendants, all of which are affiliated companies, perpetrated in the course of providing transition management[2] and brokerage services to ERISA plans.

4.      During the Class Period, Defendants represented that they would perform transition management and brokerage services, both of which involve execution of trade orders for the purchase and sale of securities, solely as the customer's agent.  Defendants represented, further, that they would be compensated for their services by receiving disclosed commissions on the purchase or sale of securities.  Certain Defendants are registered brokers ("Broker Defendants").[3]  The Broker Defendants owed their customers a duty of best execution when acting as an agent.

5.      In reality, under Defendants' double-charging scheme, Defendants received both the disclosed commissions and additional undisclosed and unauthorized fees that often exceeded the disclosed commissions received from the ERISA plans that used their services.  Defendants generated the additional, undisclosed fees by funneling trade orders for the purchase and sale of securities to an off shore subsidiary broker located in Bermuda.  The subsidiary broker executed the trade orders as a principal, rather than an agent.  The subsidiary broker then added a markup on the price, for a purchase, or a markdown, for a sale.  By doing so, the subsidiary broker

---

[2] "Transition Management" in this Complaint refers to large-scale sales and/or purchases of securities that are necessary when transitioning institutional plan investments, *e.g.* from one entity or portfolio, such as a fund or investment advisor, to a different fund or portfolio.  The transition might be necessary, for example, so that a pension plan's investments match the preferences of a new investment advisor.  "Brokerage Services" refers to routine orders for the purchase and sale of securities.

[3] The Broker Defendants are ConvergEx Execution Solutions, LLC, ConvergEx Global Markets Ltd., and G-Trade Services LLC.

created a "spread" between the actual price and the reported price.  The Defendants confirmed

the reported price to their customers and collected and kept the undisclosed and unauthorized

"spread" as additional compensation. The profits from retaining the "spreads" on these trades

were referred to by Defendants as "trading profits" or "TP."

6.      The amount of TP income Defendants earned in this fashion varied, but it

generally equaled, or exceeded by roughly as much as 10 times, the amount of income

Defendants earned through disclosed brokerage commissions on the same trades.

7.      Defendants knew that they likely would be fired by any customer that became

aware of the double-charging scheme.  Defendants developed various strategies to prevent their

customers from discovering their scheme or the true amount of the fees Defendants collected.

These included using software to mask their identities when executing trades and telling

customers that they were experiencing technical difficulties when customers asked for detailed

trading information.

8.      The Broker Defendants' conduct violated their duty as brokers acting as agents to

act in the interests of their principals, *i.e.*, the ERISA plans, and their duty to obtain best

execution for their principals when trading.

9.      Defendants functioned as ERISA fiduciaries and their conduct violated ERISA

fiduciary duties of prudence and loyalty and constituted prohibited transactions in violation of

ERISA.

10.     The SEC and DOJ opened investigations into Defendants' scheme.  In December

2013 the SEC settled civil charges with Defendants ConvergEx Execution Solutions LLC,

ConvergEx Global Markets Ltd. and G-Trade Services, LLC; the DOJ entered into plea

agreements with Defendant ConvergEx Global Markets Ltd. and certain individual defendants. As part of the SEC settlement, those settling Defendants admitted to the essential facts of the scheme in sections III.B and C of the SEC order attached hereto as Exhibit 1 (Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 and Section 203(e) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease and Desist Order, *In the Matter of G-Trade Services LLC, ConvergEx Global Markets Ltd., and ConvergEx Execution Solutions LLC*, Admin. Proceeding No. 3-15654 (S.E.C. Dec. 18, 2013), ("Order")**.**

## II.  JURISDICTION AND VENUE

11.    Members of the Class are participants, beneficiaries, and named fiduciaries of "employee benefit plans" within the meaning of ERISA, 29 U.S.C. § 1002(3), and Plaintiff Landol Fletcher is a plan participant within the meaning of ERISA, 29 U.S.C. § 1002(7).  Plan participants are authorized to bring actions such as this to obtain appropriate relief for their plan. ERISA, 29 U.S.C. § 1132(a)(2) and (3).

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and ERISA, 29 U.S.C. § 1132(e)(2).  A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district; all of the Defendants transact business in this district; and most of the Defendants reside in and may be found in this district.

13.    This Court has jurisdiction over Defendant ConvergEx Global Markets Ltd. ("Global Markets"), a wholly owned Bermuda subsidiary of Defendant ConvergEx Group LLC as described below, because Global Markets purposely availed itself of the benefits of the laws of this jurisdiction by engaging in activities that reveal an intent to invoke or benefit from the

protection of New York state's laws and those of the United States.  Specifically, Global Markets joined with the other Defendants as a willing and knowing participant to perpetrate the double-charging scheme alleged herein and set forth in full in the Order attached as Exhibit 1.

14.    Global Markets received ERISA plan trade orders for the purchase and sale of securities from Global Transition Management ("GTM"), an unincorporated business division of Defendant ConvergEx Execution Solutions LLC ("CES").  Global Markets also received ERISA plan trade orders from the ConvergEx Global Markets Division, an unincorporated division of Defendant G-Trade Services LLC ("G-Trade").  Both Defendants CES and G-Trade are headquartered in New York City. CES and G-Trade sent the trade orders to Global Markets by entering them into the Global Markets order management system in their New York offices and their other offices located in the United States.  Global Markets executed the trades as a principal and added markups or markdowns pursuant to the double-charging scheme alleged herein. Global Markets then returned the trades via the Global Markets order management system to CES and G-Trade in New York.  Defendants CES and G-Trade provided Defendant Global Markets with a steady stream of trades to execute for ERISA plan customers in the United States. Defendants, however, did not disclose that they sent their ERISA plan customers' trade orders to Global Markets in Bermuda for execution.

15.    Alternatively, the Global Markets order management system, through which a steady stream of trade orders flowed from CES and G-Trade in New York to and from Global Markets in Bermuda, constituted continuous and systematic contacts with the United States sufficient to support jurisdiction over Global Markets by this Court.

## III.    PARTIES

### A.    Plaintiff

16.    Plaintiff **Landol D. Fletcher** is a participant in the Central States Plan, an ERISA-covered pension plan. Mr. Fletcher began participating in the Plan in approximately 1980.  Mr. Fletcher has vested benefits in the Plan, but is not currently receiving those benefits as he is still working.  Mr. Fletcher resides in Buford, South Carolina.

### B.    Defendants

17.    Defendant **ConvergEx Holdings LLC**, is a Delaware corporation and holding company, and parent of ConvergEx Group LLC.  It is privately held and has headquarters in New York, New York.

18.    Defendant **ConvergEx Group LLC** ("**ConvergEx**") is a Delaware corporation and subsidiary of ConvergEx Holdings LLC.  It is privately held and is headquartered in New York, New York.  ConvergEx Group describes itself on its website as "a leading provider of global brokerage and trading-related services for institutional investors and financial intermediaries." Its website touts its "client-first service."  It was formed in October 2006 as BNY ConvergEx Group when The Bank of New York joined forces with Eze Castle Software and GTCR Golder Rauner, LLC, a private equity firm. ConvergEx Group is the corporate parent of Defendants ConvergEx Global Assets Ltd., G-Trade Services LLC, and ConvergEx Execution Solutions LLC.

19.    Defendant **ConvergEx Execution Solutions LLC ("CES")** is a Delaware company with headquarters in New York, New York.  It is a subsidiary of ConvergEx.  It is a brokerage and investment advisory firm.  Global Transition Management is an unincorporated business division of CES, which offers transition management services. Global Transition Management

sent ERISA plan trade orders to Global Markets in Bermuda via the Global Markets order management system.

20.   Defendant **ConvergEx Global Markets Ltd. ("Global Markets")** is a Bermuda company and wholly-owned subsidiary of ConvergEx, registered during the Class Period as a broker-dealer with the Bermuda Monetary Authority.  During the Class Period, it transacted business with, and provided services to, entities in this district and throughout this country and the world.

21.   Defendant **G-Trade Services LLC (**"G-Trade") is a registered broker-dealer and a wholly-owned subsidiary of ConvergEx.  It is headquartered in New York.  The ConvergEx Global Markets Division is an unincorporated business division of G-Trade, which offered global trading services during the Class Period.  The ConvergEx Global Markets Division sent ERISA plan trade orders to Global Markets in Bermuda via the Global Markets order management system.

22.   **Does 1-10** are additional entities, whose identities are currently unknown to Plaintiff, but upon information and belief are affiliated with one or more Defendants and also participated in the scheme alleged herein.

### IV.  FACTUAL BACKGROUND

**A.    Plaintiff's Plan**

23.   The Central States Plan in which Plaintiff Landol Fletcher participates is an "employee pension benefit plan" under ERISA, 29 U.S.C. §1002(2)(A). It is also a traditional defined benefit pension plan.[4]  The custodian of the Plan's assets is a subsidiary of Bank of New

---

[4] There are two generic types of ERISA-covered retirement plans—defined benefit plans and defined contribution

York Mellon Corporation ("BNYM").  BNYM has a minority ownership interest in one or more of the Defendants.  During the Class Period, BNYM used one or more of the Defendants as its principal provider of brokerage services for ERISA plans for which it was a custodian.  During some of the Class Period, CES was known as BNY ConvergEx Execution Solutions LLC.

24.     The Central States Plan is currently "underfunded," *i.e.*, its projected assets and future returns are insufficient to meet its projected liabilities. The Plan's actuary has certified the Plan's funding status as "critical" (also called the "red zone") for plan years 2008, 2009, 2010, 2011, and 2012. "Critical" is the worst plan status possible under the Pension Protection Act of 2006. As required by law, the Plan Trustees adopted a rehabilitation plan in 2008. While the Plan expects to forestall its possible insolvency until 2021 or later, there is no reasonable prospect that current benefits will be fully funded. The Plan states that its "rehabilitation plan . . . is expected to last indefinitely." In other words, the Plan does not *ever* expect to fully fund its liabilities.

25.     In 2005, the Central States Plan sought IRS relief in the form of a request for 10-year amortization of the Plan's unfunded liabilities. In 2008, the Plan was unable to meet its amortization schedule, so it sought further relief from its minimum funding requirement. The IRS never granted or denied the request to decrease minimum funding requirements. The Plan again failed to meet its amortization schedule in the Plan year ending December 31, 2011, but the Plan did not seek or receive further relief from the IRS.

26.     The Central States Plan's 2011 annual report filed on Form 5500 with the U.S. Department of Labor indicates that the Plan had 58.9% of the assets necessary to pay projected

---

plans. Defined benefit plans are traditional pension plans in which the amount of benefit a participant receives is fixed; defined contribution plans are plans such as 401(k) plans in which participants contribute a portion of their earnings to an account, invest it, and then receive the proceeds upon retirement.

benefits. According to the Plan's 2012 Annual Funding Notice, its "funding percentage" in 2012 dropped to 53.9%. Based on its Form 5500s filed for years 1998 through 2012, the Plan has not been fully funded. The assets of the Central States Plan are the assets that Mr. Fletcher and other Plan participants and beneficiaries must look to for assurance that their vested accrued retirement benefits are paid as required by ERISA.

27.    In view of the Plan's significant underfunding, the Plan's Trustees froze or reduced certain benefits including reducing the benefit accrual rate from 2% of contributions to 1% of contributions; freezing certain early retirement benefits at their year-end 2003 levels; and eliminating retirement benefits for all employees who would seek to retire before age 57; these included benefits for which Plaintiff Fletcher had been eligible.

## B.    Defendants' Status as ERISA Fiduciaries

28.    Every ERISA plan must have one or more named fiduciaries to administer and manage the plan. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries, but also any other person who in fact performs fiduciary functions.  Specifically, under ERISA's functional test, a person is a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets…."  29 U.S.C. § 1002(21)(A)(i) (emphasis added). Thus, an entity is an ERISA fiduciary if it exercises discretionary authority or control in managing the plan, or, if it exercises any authority or control (discretionary or not) respecting management or disposition of plan assets.

29.    Defendants were fiduciaries of the Central States Plan and other class members' plans because they exercised control and authority over disposition of plan assets.  Their exercise

of this control and authority included control and authority over the disposition of plan assets for

purposes of transition management and execution of securities trades.  In their roles, Defendants

controlled and/or had authority over the ERISA-governed funds involved in the trades.

30.    Defendants also were fiduciaries of the Central States Plan and other class

members' plans because by trading as a principal through the scheme described above, they

determined the amount of compensation they received for the transition management and

brokerage services they provided to members of the Class.  Defendant Global Markets set the

Defendants' additional compensation by unilaterally adding unauthorized markups and

markdowns to the prices of securities which they purchased or sold for their ERISA plan

customers pursuant to the customers' trade orders.  The Defendants confirmed the marked up

and marked down prices to the ERISA plan customers and collected and kept the "spread" as an

unauthorized and undisclosed additional fee.  Under the double-charging scheme, Defendants

unilaterally determined the amount of their compensation.  As such, Defendants retained

discretion and authority over the fees paid by ERISA plans, and they exercised authority or

control over the disposition of plan assets, some of which they impermissibly retained.

Defendants are therefore fiduciaries with respect to their compensation and are liable for

breaches of fiduciary duty and prohibited transactions arising out of Defendants' compensation

practices.

31.    Defendants' control over setting their own fees, without disclosing these amounts,

further establishes Defendants' fiduciary status under ERISA § 3(21)(A)(i), because they

collected hidden fees.

**C.      Defendants' Double-Charging Scheme**

32.    CES and G-Trade offered global securities trading services as brokers.  They represented that they provided transition management and brokerage services solely as an agent. They also represented that they only charged commissions that were fully disclosed for their transition management and brokerage services.

33.    CES and G-Trade received trade orders for the purchase and sale of securities for ERISA plan customers. Ostensibly, CES and G-Trade acted as agents on behalf of ERISA plan customers and charged a disclosed commission.  In this capacity, CES and G-Trade received customer orders and entered them into Global Markets's order management system, which allowed CES and G-Trade automatically to route the customer trade orders to Global Markets in Bermuda.

34.    When Global Markets received a customer trade order, Global Markets traded on the order for its own account as a principal, rather than executing the trade as an agent on behalf of the customer.  For example, assume CES received a trade order for an ERISA plan to purchase 500 shares of Company A stock. Company A is a U.S. company and its stock trades on the New York Stock Exchange. CES entered the trade order into the Global Markets order management system.  In Bermuda, Global Markets went to a local stock exchange and purchased 500 shares of Company A stock for its own account, as a principal. Global Markets would then sell the 500 shares it purchased to the customer, again as a principal, with a markup. If Global Markets paid $1.00 per share for a total price of $500.00, by adding a markup of $ .10 per share, Global Markets could sell the shares to the customer for $550.00, creating a spread of $50.00.

Defendants would report the purchase price to the customer as $550.00 instead of $500 and collect and keep the $50.00 spread as "trading profits."

35.     Defendants' scheme was orchestrated as alleged above and as detailed in the Order attached as Exhibit 1 to this Complaint.  Sections III.B and C, ¶¶ 1-44, of Exhibit 1. Plaintiff did not discover, and neither Plaintiff nor the Class members could have discovered, Defendants' wrongdoing or the injuries caused thereby until no earlier than the date of the Order as set forth in ¶ 54 of the Order.

36.     Global Markets often took TP on orders to buy or sell stocks listed on U.S. exchanges.  Most of these orders were received in the New York office of CES or G-Trade. Instead of routing those orders to CES, which was ConvergEx's U.S. trading arm and a member of the U.S. exchanges, Defendants unnecessarily routed those orders to Global Markets in Bermuda in order to take TP.

37.     The trade confirmations disclosed the commission charged by CES or G-Trade, but did not state that Global Markets also had taken a markup or markdown on the price at which the off shore broker filled the order.

38.     During 2009 alone, Defendants managed over one thousand transitions involving asset transfer volumes in excess of $300 billion.  Many of these were for Class members' plans. In managing such transitions, Defendants typically earned at least $600,000 per each $1 billion transitioned.  Of this, at least half, or $300,000 per $1 billion, represents overcharges resulting from principal trading.

39.     During the Class Period, on information and belief, Defendants provided brokerage and/or transition management services to the Central States Plan, and the Plan suffered losses

from Defendants' scheme as a result.  These losses increased the risk that Plaintiff Fletcher will

not receive the benefits to which he is entitled under the Plan.  Defendants reaped millions of

dollars of ill-gotten gains and profits from their double-charging scheme  which caused

Defendants' ERISA Plan customers to suffer substantial losses.

40.    During the Class Period, as detailed herein, the Defendants engaged in a scheme to

deceive Plaintiff, the Central States Plan, and the Class members and their plans, and a course of

conduct that operated as a deceit on Plaintiff, the Plan, and the Class members and their plans by

failing to disclose and misrepresenting the adverse facts detailed herein.  As a direct and

foreseeable result of their deceit, Plaintiff, the Central States Plan, and the other Class members

and their plans suffered economic loss as a result of Defendants' conduct.

41.    Plaintiff brings this action to recover losses incurred by the Class members and their

plans as a result of Defendants' conduct, and to obtain all other relief afforded by law.

## V.  THE RELEVANT LAW

### A.    Fiduciary Duties under ERISA

42.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims.

43.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

>        (a)     The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan;

>        (b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

>        (c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

44.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, not to provide false information about fees, and to disclose information that participants need in order to exercise their rights and interests under the plan. Lying—or hiding fees—is inconsistent with the duty of loyalty.

## B.     Co-Fiduciary Duties under ERISA

45.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach of co-fiduciary," provides, in pertinent part,

>        In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)     if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

46.   Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, more than one ERISA fiduciary involved in a given issue.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .  [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

**C.      Prohibited Transactions under ERISA § 406(b)**

47.    ERISA § 406(b), 29 U.S.C. § 1106(b), prohibits certain transactions between fiduciaries and a plan.  Section 406(b) creates "a per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § [4]06(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans." *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (2001) (internal quotations omitted).  ERISA § 406(b) provides the following:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**E.      Civil Remedies under ERISA**

48.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant or a fiduciary for relief under ERISA § 409, 29 U.S.C. § 1109.

49.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any

> profits of such fiduciary which have been made through use of assets of
> the plan by the fiduciary, and shall be subject to such other equitable or
> remedial relief as the court may deem appropriate, including removal of
> such fiduciary.

50.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and

fiduciaries to seek equitable relief from Defendants, including, without limitation, injunctive

relief and, as available under applicable law, constructive trust, equitable surcharge, restitution,

and other monetary relief.

51.     Plaintiff therefore brings this action with regard to the Class under the authority of

ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans

arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §

404(a)(1) and ERISA § 405(a), as well as pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

for equitable relief from Defendants as fiduciaries, including, without limitation, injunctive relief

and, as available under applicable law, constructive trust, equitable surcharge, restitution, and

other monetary relief.

## VI.  CLASS ALLEGATIONS

52.     Class treatment is appropriate in this case because it would promote judicial

economy by adjudicating the Plaintiff's claims with respect to all class members.

53.     **Class Definition.**  Plaintiff brings this action as a class action pursuant to Federal

Rules of Civil Procedure 23(a) and (b)(1) (and in the alternative (b)(3)) on behalf of the

following Class:

> The participants, beneficiaries and named fiduciaries of all ERISA Plans
> for which any Defendant provided transition management or brokerage
> services in which Defendants added unauthorized and undisclosed
> markups and markdowns under the double charging scheme at any time
> from October 2006 and December 2011.  Excluded from the Class are any

officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of the Defendants or any of their respective predecessors in interest or any entity in which any Defendant or any of their respective predecessors in interest have a controlling interest.

54.     **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA Plans sustained losses through Defendants' unlawful scheme, including ERISA Plans with thousands of participants.[5]  As discussed above, Defendants managed over one thousand transitions in 2009 alone.

55.     **Commonality.**  Class members are all victims of the same double-charging scheme perpetrated on the ERISA Plans.  The questions of law and fact common to the Class include, but are not limited to:

a.     Whether Defendants double-charged the Class members' plans  for brokerage and transition management services by not only collecting a commission but also trading as a principal and retaining the "spread" or Trade Profit as an additional, undisclosed fee;

b.     Whether the Broker Defendants breached their duty to provide best execution by both receiving a disclosed commission and trading as a principal;

c.     Whether Defendants are liable under ERISA as fiduciaries because in providing services for the ERISA Plans, they set their own variable fee or compensation under the double-charging scheme;

d.     Whether Defendants breached their ERISA fiduciary duties of prudence and loyalty by profiting on transition management and other brokerage services both by charging a disclosed commission and retaining additional undisclosed fees; and

---

[5] In 2011 the Central States Plan had over 400,000 participants.

e.     Whether Defendants' double-charging scheme caused injury to Plaintiff, the Plan and the Class members and their plans and the amount of injury sustained.

56.     **Typicality.**  Plaintiff's situation is typical of all Class members in that all of the ERISA Plans were subject to the same double-charging scheme and all Class members and their plans are similarly affected and injured by Defendants' conduct in violation of federal laws that is complained of herein.

57.     **Adequacy.**  Plaintiff will fairly and adequately protect the interests of Class members.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class. Plaintiff will vigorously protect the interests of absent class members.

58.     Plaintiff has retained counsel who are competent and have extensive experience in complex class action, financial, pension plan and ERISA litigation. Plaintiff's counsel includes the firms McTigue Law LLP, Keller Rohrback L.L.P., and Beins Axelrod, P.C.  Counsel have agreed to advance the costs of the litigation contingent upon the outcome.  Counsel are aware that no fee can be awarded without the Court's approval.

59.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by class members would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

60.   **Rule 23(b)(3) Requirements.**  Certification under Rule 23(b)(3) is appropriate, in the alternative, because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII.  CLAIMS FOR RELIEF

## COUNT I

**Breach of Duties of Prudence and Loyalty: Collection of Excessive Hidden Fees (Violation of ERISA, 29 U.S.C. §  1104 by All Defendants)**

61.   All previous averments are incorporated herein.

62.   At all relevant times, the Defendants were fiduciaries of their ERISA Plan customers within the meaning of ERISA, 29 U.S.C. §1002(21)(A). As such, they are bound by the duties of loyalty, exclusive purpose, and prudence.

63.   Defendants breached their ERISA fiduciary duties of prudence and loyalty, 29 U.S.C. §1104(a)(1)(A), (B), by, *inter alia*:

a.   Charging the Plans excessive and improper fees for transition management brokerage services that resulted in windfall profits for Defendants;

b.   Failing to disclose to the Plans, their fiduciaries, or participants the full extent and frequency of fees being charged for transition management and brokerage services;

c.   Appropriating the Plans' assets for Defendants' own benefit, and reducing the Plans' assets available to pay the retirement benefits of their participants by, in aggregate, tens, if not hundreds, of millions of dollars;

    d.  Representing that they were providing transition management and brokerage services as an agent, when they were in fact trading as a principal; and

    e.  With respect to the Broker Defendants:  Failing to provide best execution for securities trades as brokers acting as agents are required to do;

64.    By deducting fees that were hidden from the Plans and their participants, beneficiaries and fiduciaries, Defendants breached their fiduciary duties to act with an "eye single" for the Plans as they managed and controlled plan assets.  Even channeling such fees to other entities is a breach.  And to the extent Defendants kept any of the hidden fees for themselves, they further breached their fiduciary duties.

65.    On an objective and class-wide basis, Defendants' uniform conduct in unilaterally determining what fees they would collect and their false communications about the true nature of these fees caused losses to the Plans and harmed their participants and beneficiaries. The collection of hidden fees and omissions from fee disclosures prevented plan fiduciaries from making informed decisions regarding services to the plans.

66.    Defendants' collection of hidden fees and omissions from disclosures as alleged herein were uniform because Defendants (1) collected hidden fees from all class members' plans in the same manner and (2) failed to provide complete and accurate information to any of the plans or their participants, beneficiaries and fiduciaries about those fees.

67.    As a direct and proximate result of these breaches of fiduciary duty, the Plans and their participants and beneficiaries suffered tens, if not hundreds, of millions of dollars of losses, paid hidden fees, the concealment of which inhibited the Plans' abilities to make informed

decisions about how to invest Plan assets. Moreover, these losses increased the risk of non-payment of future benefits to participants and beneficiaries.

68.     As a further direct and proximate result of these breaches of fiduciary duty, Defendants were unjustly enriched.

69.     Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the Plans and/or disgorge all unjust profits caused by the Defendants' breaches of fiduciary duty.

## COUNT II

### Engaging in Self-Interested Prohibited Transactions with Plan Assets
### (Violation of ERISA, 29 U.S.C. §1106(b) by All Defendants)

70.     All previous averments are incorporated herein.

71.     As alleged above, Defendants are fiduciaries pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound not only by the duties of loyalty, exclusive purpose, and prudence, but also the prohibited transaction provisions set forth in ERISA § 406, 29 U.S.C. § 1106.

72.     ERISA prohibits fiduciaries from engaging in certain transactions and imposes strict liability for any losses that result. Specifically, "a fiduciary with respect to a plan shall not–

> **(1)** deal with the assets of the plan in his own interest or for his own account,

> * * * *

29 U.S.C. §1106(b).

73.     The Defendants, through their double-charging scheme conducted throughout the Class Period, dealt with their customer Plans' assets for their own interests and for their own accounts. They appropriated from the Plans' assets millions of dollars by both charging a

commission and trading as principal on trades and adding undisclosed and unauthorized markups and markdowns, enriching themselves at the expense of the Plans and their participants and beneficiaries.  Not only did they set and unilaterally withdraw their own compensation, they hid these amounts from the Plans and the class members.

74.     As a direct and proximate result of these prohibited transactions, the Plans, directly or indirectly, paid millions of dollars in improper fees and/or markups and mark downs and suffered millions of dollars in losses.

75.     Pursuant to ERISA, Defendants must disgorge all fees or other compensation paid them, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits collected as compensation.

## COUNT III

### Co-Fiduciary Liability
### (Violation of ERISA, 29 U.S.C. §1105 by All Defendants)

76.     All previous averments are incorporated herein.

77.     As alleged above, during the Class Period the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence, as well as the prohibited transaction provisions of ERISA.

78.     As fiduciaries of the plans and the Class members, each of the Defendants assumed a duty to protect those Plans from the improper actions of other Plan fiduciaries.

79.     ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if he knowingly participates in a breach of fiduciary duty of another fiduciary.  ERISA § 405(a)(2), 29

U.S.C. § 1105(a)(2), imposes liability if a fiduciary in the administration of his fiduciary responsibilities enables another fiduciary to commit a breach.  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if he knows of a breach by another fiduciary and fails to remedy it.

80.     All Defendants are liable as co-fiduciaries because they facilitated the breaches of their co-fiduciaries by concealing those breaches from Class members and their plans.

81.     All Defendants are liable as co-fiduciaries because they participated in a scheme which resulted in Defendants taking improper profits on securities trades involving assets of the plans.

82.     As a direct and proximate result of these breaches, the Plans and their participants and beneficiaries suffered tens, if not hundreds, of millions of dollars of losses.

83.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore all losses suffered by the Plans and their participants and beneficiaries caused by the Defendants' breaches of fiduciary duty and/or disgorge unjust profits and provide other equitable relief as appropriate.

84.     Defendants are each liable for the breaches of the others in which they participated, enabled, and/or failed to remedy pursuant to § 405(a)(1), (2), and (3) of ERISA.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court for relief as follows:

a.  Find that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure.

b.  Declare that Defendants have violated ERISA's prohibited transactions provisions;

c.  Declare that Defendants breached their fiduciary duties under ERISA;

d.  Issue an order compelling a proper accounting of the transition management and brokerage services in which the Class members' plans have engaged;

e.  Issue an order compelling Defendants to restore all losses caused to the class members' plans, including lost investment returns on money that would have been invested but for Defendants' illegal conduct;

f.  Issue an order compelling the Defendants to disgorge all fees paid by or incurred by the Class members' plans, including any profits thereon;

g.  Order a surcharge remedy to compensate the Class members' plans for their losses and/or prevent Defendants' unjust enrichment;

h.  Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

i.  Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Class members' plans;

j.  Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

k. Award Plaintiff and the other Class members their attorneys' fees and costs pursuant
to ERISA, 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

l. Award such other and further relief as the Court deems equitable and just.

Dated:   December 27, 2013

**KELLER ROHRBACK L.L.P.**

By: _____
David S. Preminger
770 Broadway, Second Floor
New York, New York 10003
Phone:  (646) 495-6198
Fax:  (646) 495-6197
dpreminger@kellerrohrback.com

J. Brian McTigue (motion for admission *pro hac vice* forthcoming)
James A. Moore (motion for admission *pro hac vice* forthcoming)
**MCTIGUE LAW LLP**
4530 Wisconsin Ave, NW
Suite 300
Washington, DC 20016
202-364-6900
Fax: 202-364-9960
bmctigue@mctiguelaw.com
jmoore@mctiguelaw.com

Lynn Lincoln Sarko (motion for admission *pro hac vice* forthcoming)
Derek W. Loeser (motion for admission *pro hac vice* forthcoming)
Margaret E. Wetherald (motion for admission *pro hac vice* forthcoming)
**KELLER ROHRBACK, L.L.P.**
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206-623-1900
Facsimile: 206-623-8986

lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
mwetherald@kellerrohrback.com

Jonathan G. Axelrod (New York Bar Number:
2012029) (motion for admission *pro hac vice*
forthcoming*)*
**BEINS, AXELROD, P.C.**
1625 Mass. Ave. NW
Washington, DC 20036
202-328-7222
Email: jaxelrod@beinsaxelrod.com

*Attorneys for Plaintiffs*

**EXHIBIT 1**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 71128 / December 18, 2013

INVESTMENT ADVISERS ACT OF 1940
Release No. 3744 / December 18, 2013

ADMINISTRATIVE PROCEEDING
File No. 3-15654

| | |
|---|---|
| In the Matter of<br><br>G-Trade Services LLC,<br>ConvergEx Global Markets Limited,<br>and<br>ConvergEx Execution Solutions LLC,<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND SECTION 203(e) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Section 203(e) of the Investment Advisers Act of 1940 ("Advisers Act") against G-Trade Services LLC ("G-Trade"), ConvergEx Global Markets Limited ("CGM"), and ConvergEx Execution Solutions LLC ("CES") (collectively, "Respondents").

II.

In anticipation of the institution of these proceedings, Respondents have submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Respondents admit the facts set forth in Sections III.B. and C. below, acknowledge that their conduct violated the federal securities laws, admit the Commission's jurisdiction over them and the subject matter of these proceedings and consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 and Section 203(e) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

**A.**     <u>**Summary**</u>

These proceedings arise out of a fraudulent scheme to conceal Respondents' practice of unnecessarily routing certain global trading and transition management customer orders to an offshore affiliate in order to charge undisclosed mark-ups and mark-downs in addition to disclosed commissions on those orders.  Respondents held themselves out to the public as a unified conflict-free agency broker that charged explicit commissions for equity order execution.  In addition to explicit commissions, however, Respondents routinely took undisclosed "trading profits" ("TP") from global trading and transition management customers by routing customer orders to an offshore affiliate, which executed orders on a riskless basis and opportunistically added a mark-up or mark-down to the price of the security.  Often the offshore affiliate consulted with the client-facing brokers to assess whether and how much TP to take, in order to minimize the risk of detection by the customer.  TP often greatly exceeded the disclosed commissions, which resulted in many customers paying more than double the amount that they thought they were paying to execute orders.  The practice of executing orders through the offshore affiliate and taking TP was not adequately disclosed to customers and was inconsistent with Respondents' purported conflict-free agency model.  In addition, through this practice, Respondents failed to seek to obtain best execution.

Respondents believed that they would lose business if customers became aware of this practice.  As a result, Respondents orchestrated a scheme to intentionally or recklessly conceal TP from customers.  The foundation of the scheme was Respondents' multiple-broker corporate structure that included the offshore affiliate, which was necessary to add an additional layer of execution charges while maintaining the appearance of technical compliance with regulatory requirements.   Respondents also engaged in specific acts to hide TP from customers, including opportunistically taking TP only when they believed that the risk of detection by the customer was low, using technological tools to conceal their identity in otherwise transparent markets, intentionally delaying the implementation of real-time trade reporting and utilizing proprietary software applications to quickly fabricate false execution prices.  In addition, Respondents made false and misleading statements to customers who inquired about Respondents' overall compensation, including providing certain customers with falsified trading data to cover up the fact that the offshore affiliate had taken TP on their orders.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

Customers with large orders, including those arising out of the global trading and transition management services at issue here, typically rely on their brokers to execute orders on their behalf at the most favorable terms reasonably available under the circumstances. Monitoring the execution of these orders and assessing the quality of a broker's services can be difficult for even the most sophisticated customers – particularly given the complex nature of today's markets, where brokers often need to choose from a variety of order types, routing strategies, and trading venues to execute large orders. Customers rely on the honesty and expertise of their brokers and are ill-positioned to decipher disclosures that may be technically accurate but are materially misleading.[2] Often, as in this case, customers ask their brokers for general information on how their orders are handled, as well as request specific data to enable more detailed tracking of execution quality. In such cases, brokers must provide accurate information, without material misstatements or omissions, including by responding to customer inquiries in a transparent and complete manner, in order for customers to be able to assess the quality and overall costs of the broker's services.

By virtue of their conduct, Respondents willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and G-Trade and CES willfully violated Section 15(c)(1) of the Exchange Act.

After commencement of the Commission's investigation, Respondents provided substantial cooperation to the Commission staff and undertook significant remedial measures. For example, the Audit and Risk Committee of Respondents' ultimate parent company retained separate counsel, who conducted an internal investigation and, together with company counsel, promptly reported to the staff the factual information developed in counsel's witness interviews and document review. Counsel consistently responded to staff requests in a timely fashion and in a useful format, and on several occasions identified significant evidence for the staff, which accelerated the progress of the investigation. Respondents also closed down the offshore affiliate, discharged a number of employees, including employees in management positions, and ceased the routing of U.S. securities offshore for order handling. Moreover, in 2012, Respondents augmented disclosures related to global trading and transition management, enhanced relevant policies, procedures and compliance programs and hired a new general counsel.

## B.    Respondents

1.    **G-Trade Services LLC** is a registered broker-dealer and a wholly-owned subsidiary of ConvergEx Group, LLC ("ConvergEx").[3] G-Trade is headquartered in New York

---

[2] *See SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, —— U.S. —— , 133 S.Ct. 1216, 185 L.Ed.2d 297 (2013) ("The law is well settled . . . that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud").

[3] ConvergEx, formerly known as BNY ConvergEx Group, LLC, is a global investment services and technology firm that was established in October 2006 through the combination of an

and has been registered as a broker-dealer with the Commission since October 2006.  ConvergEx Global Markets Division (the "CGM Division") was an unincorporated business division of G-Trade and other offshore affiliates of ConvergEx, which offered global trading services from 2006 until 2011.

       2.    **ConvergEx Global Markets Limited** was a Bermuda broker-dealer and is a wholly-owned subsidiary of ConvergEx.  CGM is not registered with the Commission in any capacity.   CGM ceased all trading activities in early 2012 and voluntarily relinquished its securities license with the Bermuda Monetary Authority in 2012.  The CGM trading model at issue in these proceedings predated the formation of ConvergEx in October 2006.

       3.    **ConvergEx Execution Solutions LLC** is a registered broker-dealer and a wholly-owned subsidiary of ConvergEx.  CES is headquartered in New York.  CES has been registered with the Commission as a broker-dealer since January 1994, and as an investment adviser since September 2006.  CES has been a member of the New York Stock Exchange since January 1994.  Global Transition Management ("GTM") is an unincorporated business division of CES and other offshore affiliates of ConvergEx, which offers transition management services.

## C.   <u>Facts</u>

### *Order Routing Practices and Customer Charges*

       4.    From 2006 through 2011, Respondents executed equity orders for institutional customers, including funds managed on behalf of charities, religious organizations, retirement plans, universities and governments.

       5.    The CGM Division offered customers global trading services, and GTM provided global transition management services.[4]  The CGM Division's global trading services involved handling large non-electronic orders for either a single stock or a basket of stocks in markets around the world, including the United States.  GTM's global transition management services involved handling large orders to buy and sell stocks for customers who were changing fund managers or investment strategies.  Customers seek out transition management services in order to minimize risks to their portfolios and preserve the value of their stocks while in transition.

---

institutional trade execution business and an investment technology company.  ConvergEx is headquartered in New York and is not registered with the Commission in any capacity.

[4]  The conduct that is the subject of this Order involves certain segments of the businesses operated by CES and G-Trade from 2006 through 2011.  These proceedings do not involve the following businesses of CES, G-Trade or their affiliates: U.S. Program and Sales Trading, Options Services, Prime Services, ATSs, Commission Management and Recapture Services, Clearing, or Technology.  These proceedings also do not involve orders executed through ConvergEx's electronic Direct Market Access ("DMA") platform.

6.      Respondents are not market makers, and they generally do not commit their own capital to facilitate customer executions or offer customers guaranteed prices. Thus, Respondents assume little, if any, market risk when they execute customer orders.

7.      GTM and the CGM Division of G-Trade acted as agent on behalf of customers and charged a disclosed commission. In this capacity, sales traders received customer orders and entered them into CGM's order management system, which allowed them to automatically route the orders to CGM in Bermuda. With a customer order in hand, CGM acted in a riskless principal capacity and bought or sold the security for CGM's own account through a local broker in the relevant market.[5] If CGM employees believed that they could add a mark-up or mark-down without detection by a non-fiduciary customer, they added one to the price received from the local broker and kept the difference for Respondents as trading profits or "TP."[6] CGM then delivered the execution back to GTM or the CGM Division of G-Trade, which confirmed the trade to the customer at a price that included TP. As a result, when CGM took TP on a customer's trade, the price reported to the customer by GTM or the CGM Division was worse than the price that CGM had received from the local broker.

8.      CGM often took TP on orders to buy or sell stocks listed on U.S. exchanges. Most of these orders were received in the New York office of GTM or the CGM Division, and instead of routing those orders to CES, which was ConvergEx's U.S. trading arm and a member of U.S. exchanges, Respondents unnecessarily routed those orders to CGM in Bermuda in order to take TP. CGM traders in Bermuda would then in turn execute the orders with third-party U.S. broker-dealers and add TP to the price received before delivering the execution back to GTM or the CGM Division of G-Trade.

9.      Each customer's trade confirmation disclosed the commission charged by CES or G-Trade, but did not state that CGM also had taken a mark-up or mark-down on the price at which the local broker filled the order.

10.     The amount of TP taken on trades often was more than the disclosed commission. It was not uncommon for the amount of TP to be several times the amount of the commission that the customer had paid CES or G-Trade. For example, GTM conducted a transition for a university, which paid GTM approximately $93,000 in disclosed commissions, but also paid approximately $543,000 in TP. Similarly, GTM conducted a transition on behalf of a

---

[5]  In general, a "riskless principal" trade occurs when a broker-dealer, after receiving a customer order to buy (or sell) a security, buys (or sells) the security for its own account from (or to) another person in a contemporaneous offsetting transaction and then allocates the shares to the customer order.

[6]  Some customers asked Respondents to handle their trades on a fiduciary basis. When customers requested fiduciary treatment, Respondents did not take TP on those customers' trades and typically charged those customers higher disclosed commission rates.

charitable organization, which paid approximately $33,000 in disclosed commissions, but also paid approximately $283,000 in TP.  In both cases, the transitions involved trades only in securities listed on U.S. exchanges, yet GTM unnecessarily routed the customers' orders offshore to CGM in order to take TP.

        11.    TP was an important revenue source for Respondents, and the profitability of CGM and GTM in large part depended on it.

### Concealing TP from Customers

        12.    Many employees of Respondents, including certain members of their senior management, understood that customers likely were unaware of CGM's practice of taking TP and would fire them if they learned of the practice.  As a result, from 2006 through 2011, as described herein, Respondents engaged in a fraudulent scheme by taking steps to intentionally or recklessly conceal from customers the practice of taking TP.

### Marketing Materials and Disclosures

        13.    From 2006 to 2011, Respondents marketed themselves as a "conflict free" agency-only broker offering global execution services.

        14.    Some of Respondents' marketing materials described Respondents' global trading services under the "BNY ConvergEx Group" brand as a "conflict-free" solution with access to global markets "all through one organization."   With respect to these services, Respondents stated that "[o]ur interests are aligned with yours."  Likewise, Respondents stated, "[o]ur primary interest is putting your interests first."

        15.    GTM at times marketed its transition management services by stating, "with our agency-only platform, our interests are always fully aligned with yours."  GTM also at times promoted its transition management services as the customer's "conflict-free advocate."  GTM at times further advertised that it eliminated "unnecessary transactions" and promised "full transparency."  For these services, GTM at times represented to customers that the commission schedule included "all of our charges."

        16.    In light of the practice of taking TP described herein, these statements were untrue with respect to Respondents' order handling practices for non-fiduciary orders.

        17.    Respondents used several versions of customer disclosures during the relevant period, and the relevant disclosures expanded over time.  These disclosures generally stated, "Client authorizes ConvergEx, in its sole discretion and without notice, to use the services of one or more other persons or entities (including its affiliates) in connection with the execution, clearance and/or settlement of any Order and/or Transaction, or otherwise to service Client or perform its obligations, and that such persons or entities may act as principal and earn a spread[.]"

18.     These disclosures did not state the regularity with which GTM and the CGM Division of G-Trade routed orders to CGM and took TP.  These disclosures also did not state that GTM and the CGM Division routed orders for securities listed on U.S. exchanges to their affiliate in Bermuda, which took a mark-up or mark-down, instead of CES, their "U.S. trading arm" and a member of U.S. exchanges.  Furthermore, Respondents did not disclose the amount of TP that they took on trades or indicate to customers that, in many instances, they were paying several times more than the agreed-upon commission amount.

19.     Certain members of CGM's and G-Trade's senior management were aware that these disclosures did not inform customers of their routine practice of taking TP or the magnitude of the TP in comparison to the commission.

### Multiple-Broker Structure

20.     G-Trade and CES unnecessarily used CGM, which was established prior to the formation of ConvergEx, to execute certain customer orders.  This multiple-broker structure was critical to the practice of taking TP.  Specifically, GTM and the CGM Division of G-Trade received orders worldwide through sales traders located in New York and elsewhere, but maintained their global traders in a separate broker entity, CGM, which was located in Bermuda.[7]

21.     CGM in Bermuda and the CGM Division (which included New York-based global sales traders registered with G-Trade) were operated as one business.  For example, CGM's Bermuda operation was managed jointly with the CGM Division of G-Trade in New York, and TP generated in Bermuda was credited or "shadow posted" to CES and G-Trade for various business reasons, including for employee compensation determinations.  In addition, CGM's TP and commission revenues were regularly discussed with senior management of ConvergEx.

22.     There was no benefit to customers arising from the fact that the services were provided in Bermuda by a separate broker.  Rather, CGM's Bermuda operation was used as a means to take TP.  Particularly with respect to U.S. equities, GTM and the CGM Division routed certain orders to CGM in order to take TP, knowing that many trades would be more profitable for Respondents at customers' expense.  CGM did not provide additional necessary services in handling these orders and routed them back to brokers in the U.S. for execution.  Respondents thus improperly interpositioned CGM between the customer and the relevant market and failed to seek to obtain best execution on customer orders.

23.     In 2007, certain members of senior management approved GTM's decision to increase the routing of orders for U.S. equities to CGM in Bermuda.  CGM could generate more profits by adding TP to the customer's price than CES could generate by charging commissions alone.  Significantly, because there were increased settlement costs associated with routing trades

---

[7] For orders executed in Asian markets, GTM and the CGM Division routed customer orders to an affiliated broker in Hong Kong wholly owned by ConvergEx, which functioned in a similar capacity to CGM in Bermuda.

to Bermuda, certain members of senior management directed that customer orders not be routed to CGM unless there was an opportunity to take TP from customers.

### TP Taken Opportunistically

24.     Respondents concealed their practice of charging customers both commissions and TP by making decisions regarding TP on an opportunistic basis.  In other words, Respondents' decision whether to take TP, and the amount of TP to take, depended largely on whether Respondents thought that CGM could take TP without the customer detecting it.  On one occasion, CGM's then head trader directed another trader, "You must take TP, take as much as you can get away with."

25.     To this end, the CGM Division and GTM generally assessed the "sensitivity" of their customers to determine whether a particular customer was paying attention to execution quality.  The CGM Division of G-Trade and GTM communicated that information to CGM in Bermuda, and CGM did not take TP on trades for "sensitive" customers.

26.     Similarly, CGM often took TP when customers were asleep during market trading hours because of time zone differences.  On the other hand, CGM did not take TP from customers who actively monitored executions throughout the day through the receipt of real-time trade information.

27.     Likewise, CGM, with the knowledge and approval of its senior management, did not take TP on trades if customers, prior to trading, requested a "time and sales" report that would detail the times of execution and prices received on the individual executions underlying a customer's order, and thus expose any TP taken by CGM.

28.     The CGM Division also suspended the practice of taking TP at times when it knew customers were scrutinizing their executions, in order to impress those customers and secure future business.  In at least one instance, CGM suspended the practice of taking TP when a customer requested time and sales reports to analyze execution prices and then resumed taking TP after they were told that the customer was no longer conducting the analysis.

29.     Respondents also determined the amount of TP that they could take from customers based on their perception of the likelihood that the customer would detect the charge.  For example, in certain instances when Respondents perceived the risk of detection to be low, CGM took TP in an amount that resulted in customers buying at a price equal to the market high of the day and selling at a price equal to the market low of the day, where better prices could have been provided.  Senior management of CGM was aware of these practices, and when consulted, directed and approved of setting customer prices in this manner.

30.     The end result of this practice was that certain customers received worse execution prices from Respondents than they would have received if they had been more "sensitive."  Certain members of Respondents' senior management encouraged employees to

communicate information regarding customers' perceived "sensitivity" to CGM to maximize the amount of TP taken by CGM.

### *Preventing Customers from Monitoring Their Executions*

31.     To conceal TP, Respondents took steps to prevent their customers from monitoring their trade executions.  For example, certain customers were told that they needed to give Respondents prior notice in order to receive time and sales reports.

32.     Likewise, the practice of taking TP became threatened when advances in market technology prompted an increased number of customers to request intraday execution price information on their trades in "real-time."  Respondents understood that they would not be able to take TP if the customers received a live data feed that revealed the prices that CGM itself had received in the local markets for the customers' trades.

33.     As a result, CGM took steps to delay implementing real-time trade reporting for one highly profitable customer.  After the customer requested real-time reporting, the CGM Division made misleading statements to the customer indicating that it did not have the capability, and it delayed implementing the service for approximately a year in order to take TP.  To continue to take TP even after the customer started receiving real-time data, CGM, working in coordination with employees of the CGM Division of G-Trade, disabled the service periodically in order to take TP and falsely told the customer that they were experiencing technological difficulties.

### *Misrepresentations Regarding Compensation*

34.     Respondents believed that customers generally did not understand Respondents' business model with respect to TP and would fire them if they learned the truth.   As a result, Respondents further concealed their practice of taking TP by making misrepresentations and misleading statements to customers who inquired about how Respondents were compensated for their order execution services.

### *Compensation on Transitions*

35.     In response to one customer's inquiry into whether GTM could act in a principal capacity and take a spread, GTM employees first attempted to avoid answering the question, and then provided a misleading response with respect to the circumstances under which orders would be executed on a principal basis.  GTM employees also stated falsely that it was "difficult, if not impossible" to determine the amount of the mark-ups or mark-downs under such circumstances.

36.     At times, GTM also provided untrue responses to requests for pre-transition proposals for some customers.  For example, one customer's request for proposal for transition management services asked GTM directly: "Describe your revenue source.  How transparent is your revenue?"   A GTM employee responded: "All of our revenue sources are commission based,

and are fully disclosed.  Other than explicit commissions, we do not charge any additional fees."  While this response was technically accurate from the narrow perspective of GTM, the response omitted the fact that the customer would pay TP in addition to the explicit commissions charged by GTM, and was thus misleading.

37.    In response to another customer's inquiry regarding the spread disclosure language in the transition management agreement, a GTM employee falsely stated that principal trading is "rarely used in our transition business" and "we can assure you that no principal trading has been carried out in any transition for [the customer.]"  The GTM employee further stated that "[s]hould it ever be necessary, prudent or strategically important" to engage in principal trading for the customer, GTM "would always discuss and seek your approval."  This statement was approved expressly by a senior manager of GTM, who knew that the statement was untrue.

### Falsified Time and Sales Reports

38.    Certain customers requested time and sales reports for trades on which CGM had taken TP.  Because CGM had added a mark-up or mark-down to the price received from the local broker in order to take TP, the average of the prices reflected on the time and sales reports would not match the price previously reported to the customer on the trade confirmation.  Due to these discrepancies and the risk of the inquiring customers finding out about TP, certain employees of CGM and G-Trade's CGM Division lied to customers rather than acknowledge the undisclosed mark-ups and mark-downs.

39.    In some instances, customers were falsely told that the time and sales reports no longer existed.  On at least six occasions involving at least four different customers, CGM employees altered the time and sales data reflecting CGM's actual execution prices, so that the prices given to the customers would average to the price, inclusive of TP, previously reported on the customers' confirmations.  Once these reports were prepared, CGM or CGM Division employees transmitted the data to customers in a format that made it difficult for the customer to analyze.  Senior management of CGM was aware that these false reports were provided to customers who asked for prints for their trades.

### Technological Tools

40.    Respondents employed technological tools to conceal their practice of taking TP from their customers.

41.    On at least one occasion, when the now former head trader for CGM believed that there might be market transparency on trades that were part of a transition, with the approval of certain members of senior management, he used algorithmic tools and anonymous broker codes to hide CGM's identity in the market so that the customer could not identify with whom CGM traded or the prices it received.  Although this algorithmic tool could be used for legitimate purposes, such as promoting market anonymity in order to minimize market impact of trades, the former CGM head trader used this anonymity on this occasion to add a mark-up or

mark-down on the prices that CGM had received on the customer's trades in order to take TP without the customer knowing it.

42.     In addition, Respondents developed and implemented software known as "AutoTP" that allowed traders to quickly compare actual execution prices to market highs, lows and various benchmarks.  This tool helped traders to maximize TP and arrive at a customer price that minimized the likelihood of detection by the customers.

### Inadequacy of Procedures

43.     Throughout the relevant period, Respondents lacked adequate policies and procedures related to monitoring execution quality for orders routed to CGM.  Indeed, until November 2008, Respondents had no formal policies and procedures in place to evaluate CGM's execution quality.  Even after Respondents adopted such policies, Respondents failed to effectively implement and review compliance with those policies.  Respondents also ignored a number of red flags related to the concealment of TP.

### Advice of Counsel

44.     On certain occasions, ConvergEx and a predecessor entity retained outside law firms in the United States and elsewhere to advise on the adequacy of certain disclosures in light of CGM's taking of TP on trades in global securities.  Many of Respondents' employees were generally aware of these reviews.  None of these employees, however, was told that outside counsel had approved concealing the practice from clients.  Indeed, these law firms were not advised that Respondents sometimes routed trades consisting solely of U.S. securities to Bermuda, nor were they told that CGM and GTM deliberately concealed TP from customers, that CGM routinely took TP in an opportunistic manner, or that CGM and GTM employees made false statements to customers in order to conceal their practice of taking TP.

## D.    Violations

45.     As a result of the conduct described above, Respondents willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities.

46.     As a result of the conduct described above, Respondents G-Trade and CES willfully violated Section 15(c)(1) of the Exchange Act, which prohibits fraudulent conduct by a broker-dealer in effecting, inducing or attempting to induce any securities transaction.

## E.    Respondents' Remedial Efforts and Cooperation

47.     In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondents and cooperation afforded the Commission staff.

**F.**    **Undertakings**

G-Trade and CES undertake to:

48.    Retain, at the expense of G-Trade and CES and within thirty (30) days of the issuance of this Order, a qualified independent ethics and compliance consultant (the "Consultant") with extensive experience in developing, implementing and overseeing organizational compliance and ethics programs, not unacceptable to the staff, to conduct an ethics and compliance program assessment.  G-Trade and CES shall cause the Consultant to analyze whether the components of G-Trade's and CES's ethics and compliance program set forth below are having the desired effects, determine whether the culture is supportive of ethical and compliant conduct and provide advice and recommendations to strengthen the program and enhance the culture of compliance.  G-Trade and CES shall cause the Consultant to:

a.    review the creation, administration and implementation of the compliance and ethics program, including but not limited to reviewing key documents (e.g., business principles, Code of Conduct, policies and procedures, risk assessments, performance evaluation forms, relevant internal training materials and internal communications), conducting an assessment survey and interviewing relevant personnel;

b.    review and evaluate G-Trade's and CES's policies, practices and procedures related to best execution and the provision of information to customers concerning order handling and compensation for trade execution, including but not limited to related written disclosures, advertising materials and other communications with customers and prospective customers;

c.    evaluate the structure and functioning of the Legal and Compliance Department, including a review of the corporate culture of compliance; and

d.    report to the Commission staff and G-Trade's and CES's General Counsel and Chief Compliance Officer, as described below, regarding the Consultant's findings and recommendations;

49.    Provide a copy of the engagement letter detailing the Consultant's responsibilities to Jennifer S. Leete, Assistant Director, Division of Enforcement, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549-5546;

50.    Cooperate fully with the Consultant, including providing the Consultant with access to its files, books, records and personnel as reasonably requested for the above-described review;

51.    Require the Consultant to report to the Commission staff on his/her activities as the staff shall request;

12

52.     Permit the Consultant to engage such assistance, clerical, legal or expert, as necessary and at reasonable cost, to carry out his/her activities, and the cost, if any, of such assistance shall be borne exclusively by G-Trade and CES;

53.     Within one hundred and fifty (150) days of the issuance of this Order, unless otherwise extended by the Commission staff for good cause, G-Trade and CES shall require the Consultant to complete the review and report to the Commission staff and G-Trade's and CES's General Counsel and Chief Compliance Officer concerning:

a.     the scope and methodologies used by the Consultant in order to complete the review;

b.     G-Trade's and CES's compliance with the review;

c.     the adequacy of G-Trade's and CES's existing policies, practices and procedures regarding the matters assessed; and

d.     the Consultant's recommendations, if necessary, regarding modification or supplementation of G-Trade's and CES's policies, practices and procedures related to the matters assessed (the "Recommendations");

54.     Within one hundred and twenty (120) days of G-Trade's and CES's receipt of the Recommendations, G-Trade and CES shall adopt and implement all of the Recommendations; provided, however, that as to any Recommendation that G-Trade and CES consider to be, in whole or in part, unduly burdensome or impractical, G-Trade and CES may submit in writing to the Consultant and the Commission staff (at the address set forth above), within sixty (60) days of receiving the Recommendations, an alternative policy, practice or procedure designed to achieve the same objective or purpose. G-Trade and CES shall then attempt in good faith to reach an agreement with the Consultant relating to each Recommendation that G-Trade and CES consider to be unduly burdensome or impractical and G-Trade and CES shall cause the Consultant to reasonably evaluate any alternative policy, practice or procedure proposed by G-Trade and CES. Such discussion and evaluation by G-Trade, CES and the Consultant shall conclude within ninety (90) days after G-Trade's and CES's receipt of the Recommendations, whether or not G-Trade, CES and the Consultant have reached an agreement. Within fourteen (14) days after the conclusion of the discussion and evaluation by G-Trade, CES and the Consultant, G-Trade and CES shall require that the Consultant inform G-Trade, CES and the staff (at the address set forth above) of his/her final determination concerning any Recommendation that G-Trade and CES consider to be unduly burdensome or impractical. G-Trade and CES shall abide by the determinations of the Consultant and, within sixty (60) days after final agreement between G-Trade, CES and the Consultant or final determination by the Consultant, whichever occurs first, G-Trade and CES shall adopt and implement all of the Recommendations that the Consultant deems appropriate;

13

55.     Within fourteen (14) days of G-Trade's and CES's adoption of all of the Recommendations that the Consultant deems appropriate, G-Trade's and CES's General Counsel and Chief Compliance Officer shall certify in writing to the staff (at the address set forth above) that G-Trade and CES have adopted and implemented all of the Consultant's Recommendations and that G-Trade and CES have established policies, practices and procedures that are consistent with the findings of this Order;

56.     G-Trade and CES may apply to the Commission staff for an extension of the deadlines described above before their expiration, and upon a showing of good cause by G-Trade and CES, the Commission staff may, in its sole discretion, grant such extensions for whatever time period it deems appropriate;

57.     To ensure the independence of the Consultant, G-Trade and CES shall not have the authority to terminate the Consultant without prior written approval of the Commission's staff and shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to this Order at their reasonable and customary rates;

58.     G-Trade and CES shall require the Consultant to enter into an agreement that provides that, for the period of engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with G-Trade and CES or any of their present or former affiliates, directors, officers, employees or agents acting in their capacity as such.  The agreement will also provide that the Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Consultant in the performance of his/her duties under this Order shall not, without the prior written consent of the Commission staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with G-Trade and CES, or any of their present or former affiliates, directors, officers, employees or agents acting in their capacity as such, for the period of the engagement and for a period of two years after the engagement;

59.     G-Trade and CES agree to certify in writing to the Commission staff (at the address set forth above), in the second year following the issuance of this Order, that G-Trade and CES have established and continue to maintain policies, practices and procedures consistent with the findings of this Order;

60.     The Commission's acceptance of G-Trade's and CES's offer of settlement and entry of this Order shall not be construed as its approval of any policy or practice reviewed by the Consultant and/or implemented based on the Consultant's Recommendation.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offer.

14

Accordingly, pursuant to Sections 15(b) and 21C of the Exchange Act and Section 203(e) of the Advisers Act, it is hereby ORDERED that:

A.      Respondents cease and desist from committing or causing any violations and any future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B.      CES and G-Trade cease and desist from committing or causing any violations and any future violations of Section 15(c) of the Exchange Act.

C.      CES and G-Trade are censured.

D.      Respondents shall, within 10 days of the entry of this Order, pay, jointly and severally, disgorgement of $79,802,448, prejudgment interest of $7,621,981 and a civil money penalty of $20,000,000, into an escrow account acceptable to the Commission's staff and provide evidence of such deposit in a form acceptable to the Commission's staff. If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. If timely deposit of the civil penalty is not made by the required payment date, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

E.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the disgorgement, interest and penalties referenced in Section IV.D. above. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this Section, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more customers based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

F.      The disgorgement, interest, civil penalties and any other funds which may be paid to the Fair Fund through this action, or as the result of any related Commission actions, shall be aggregated in the Fair Fund in accordance with any orders issued in those other actions. The Commission will appoint a Fund Administrator who will develop a distribution plan (the "Plan") with the assistance and cooperation of Respondents. The Plan will include a methodology to identify and compensate affected current and former customers of Respondents from whom TP was taken between October 2, 2006, and December 31, 2011. The Fund Administrator will

administer the Plan in accordance with the Commission Rules on Fair Fund and Disgorgement Plans.  Respondents shall be responsible for any and all costs associated with developing and administering the Plan.  Respondents shall also be responsible for any and all tax compliance responsibilities associated with the Fair Fund and may retain any professional services necessary or appropriate.  The costs and expenses of any such tax compliance responsibilities and professional services, including the payment of any taxes, penalties, and interest due, shall be borne by Respondents and shall not be paid out of the Fair Fund.  The Respondents have informed the Commission staff that the Fair Fund will constitute a Qualified Settlement Fund ("QSF") under Section 468B(g) of the Internal Revenue Code, 26 U.S.C. §468B(g), and related regulations, 26 C.F.R. §§1.468B-1 through 1.468B-5.  Respondents shall be the "administrators" of the QSF identified in 26 C.F.R. §1.468B-2(k)(3) for tax reporting and compliance purposes.  Any amount remaining in the Fair Fund after all distributions have been made and costs have been paid shall be transmitted to the Commission for transfer to the U.S. Treasury.  Under no circumstances shall any part of the Fair Fund be returned to Respondents.

G.     Respondents acknowledge that the Commission is not imposing a civil penalty in excess of $20 million based upon their cooperation in the Commission investigation and their agreement to cooperate in related enforcement actions.  If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondents knowingly failed to provide full, truthful and continuing cooperation, the Division may, at its sole discretion and with prior notice to the Respondents, petition the Commission to reopen this matter and seek an order directing that the Respondents pay an additional civil penalty.  Respondents may contest by way of defense in any resulting administrative proceeding whether it knowingly failed to provide full, truthful and continuing cooperation, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

H.     G-Trade and CES shall comply with the Undertakings enumerated in Section III.F. above.

By the Commission.

Elizabeth M. Murphy
Secretary

16